Vance *vs.* Crawford.

---

No. 48.—William Vance and others, heirs at law of Marshal Keith, deceased, plaintiffs in error, *vs.* George W. Crawford and others, Ex'rs of Marshal Keith, deceased, defendants.

[1.] On appeal trials it is competent for the Court to permit either party to amend, even after the cause has been submitted to the Jury.

[2.] The next of kin, as such merely, are entitled of common right, to call for

Vance *vs.* Crawford.

the proof, in solemn form, of the Will of the deceased. And the *mere* acquiescence of the next of kin to the probate being taken in common form, is no bar to the exercise of this right, even though they have received a legacy due them under the Will.

[3.] The time within which this proceeding may be had, is not defined by the Common Law.

[4.] But the receipt of legacies under the Will, and the long acquiescence by those interested in contesting the first probate, may amount to a waiver of the rights of the Caveators, unless the delay is accounted for and excused by some special circumstance, such as infancy, absence from the country, &c.

[5.] In a petition to have the first probate of a Will set aside, the heirs at law who have received legacies under it, will not be heard, if they do not bring back or offer to return the legacies paid them by the executors.

[6.] Where the Testator, by his Will. gave certain slaves to the Secretary of the Colonization Society, for the purpose of being sent to Liberia; and also Bank Stock, the proceeds of which were to be paid to the said slaves, or their survivors, on their arrival in Liberia, it is a valid bequest.

[7.] As it is not against the policy of the State of Georgia, for the owner of slaves to remove them out of the State for manumission, he may direct it to be done by Will.

Caveat to Will. On Appeal, in Columbia Superior Court. Tried before Judge HOLT, at March Term, 1848.

The plaintiffs in error gave notice to the defendants in error, to prove the Will of their testator, Marshal Keith, in solemn form, in the Court of Ordinary of Columbia county, which notice being complied with, an appeal by consent from that Court, was taken to the Superior Court of Columbia county. The cause came on to be heard at the March term, 1848, of said Court, when the counsel for plaintiffs in error, moved to strike out the following allegata of the Executors—First, on the ground that they were filed at that term, and notice had not been given to the heirs at law, as required by the rules of the Superior Court; and second, to strike out the *second* clause, on the ground of not being pertinent to the issue.

"And the said George W. Turner and William, further say, that the said William Vance and Harriet his wife, Isaac A. Hibler and Judith his wife, and Tarlton F. Keith, at whose instance they have been cited to prove said Will in solemn form, acquiesced in the same, received legacies under it, and permitted the Executors to go on in the execution thereof, without objection."

The Court overruled both motions; which decisions have been alleged as error.

The plaintiffs in error objected to the receipts given by them for specific legacies, going in evidence, because irrelevant; and being admitted by the Court, they except to the same as error.

They also objected to evidence, to shew that the slaves freed and manumitted by the Will, were in the State of Ohio; which being admitted by the Court, they excepted to the decision as erroneous.

They also objected to the books of the Ordinary, containing the returns of the Executors, going in evidence to bring constructive notice to the heirs of the acts of the executors; which being admitted by the Court, they excepted to the decision as erroneous.

The will of Marshal Keith is set forth at length in the opinion of the Court, to which the reader is referred.

The testimony adduced on the trial of the issue as agreed on, was—

"That Vance and wife, and Hibler and wife, received from the Executors the amount of the specific bequests made to them by the will, and receipted for them in March 1842; that Hibler resided in Augusta at the time of Keith's death, and until the Fall of 1846; that Vance, during that time and to the present, resides in Edgefield District, S. C. about 25 miles above Hamburg.

"That the Executors have paid, under the residuary clause of the will, to the persons therein named, about $40,000.

"That the slaves bequeathed to be free, went to Ohio within a year or two after Keith's death; as well as Alfred, Daniel and Thornton, bequeathed to the Colonization Society; and that the Executors paid to them, the shares of stock bequeathed to them, on the condition of their going to Liberia, without their going there; Jones, to whom Thornton was conditionally bequeathed, giving his assent.

"That the due execution of the will was proved by two of the subscribing witnesses, the other being dead; and that the Executors made regular returns of their receipts and expenditures to the Court of Ordinary; five of such returns being in evidence."

The Court charged the Jury:

1st, "That the heirs at law, at whose instance the Executors are cited to make proof of the will, are not entitled to be heard

in Court on this issue, without first having brought and deposited in Court, the amount of the several legacies received by them under the will.

2nd, " That a will is not " utterly null and void," under the 4th section of the Statute of 1818 ; because certain clauses in it, might be for the freeing and manumitting of slaves.

3rd, " That the clauses of a will containing bequests to Executors as trustees for the use of slaves, were not utterly void under the Acts of 1801 and 1818, unless it appeared that it was the absolute intention of the testator, that the slaves should remain in Georgia.

4th, " That the bequests of slaves and other property to the Executors of a will, as trustees for the use of the slaves, was not void, unless made with the absolute intention, that the slaves having the beneficiary interest, should remain in this State ; and that on such slave, going to a free State, they would hold the Executors accountable for the property held by them under such trust."

To all which plaintiffs in error excepted, and now allege the same as error.

SNEAD & MILLEDGE, for plaintiff, in error.

I. In relation to the pleadings, the Court erred,

1st, By over-ruling the motion of plaintiffs in error to exclude the allegata of defendants, as part of the pleadings :

Because, no notice of its contents was given to the opposite party. *Rules of Court, title Appeal, 4th clause, 1st sec. Hotchkiss,* 943.

2nd, In over-ruling the motion to strike out the *second ground* of defendant's pleadings :

Because, if regularly before the Court, this ground was inap plicable to the issue—And further, it not being inconsistent that the plaintiffs should have rights, as heirs at law, as well as legatees. *Judiciary Act of* 1799. *Hotchkiss,* 547, *sec.* 44, *title, Petition and Process. Answers Rules of Court, do.* 943, 2d *sec.* 2 *Kinne,* 722.

II. In the admission of improper evidence to the Jury, the Court errde

1st, In admitting the receipts of plaintiffs in error, for bequests under the will :

Because, irrelevant to the issue ; and if the pleadings were

improperly retained, there was no ground to justify their admission.

2nd, In admitting testimony to show that the slaves freed by the will, were in Ohio:

Because, the slaves being in another State, could not render them legally free, if the will be in contravention of the laws of this State. *Wheeler's Law of Slavery*, 311, 312—citing *7th Louisiana Rep.* 135, *Mary vs. Morris.*

3rd, In admitting the returns of the Executors to the Court of Ordinary:

Because, they were not proper evidence to charge the heirs with a knowledge of the administration by the Executors under the will, further than the heirs were connected with such acts.

III. In the charge delivered to the Jury, the Court erred,

1st, In instructing the Jury, that the heirs at law had no right to be heard in Court on the issue, without first bringing and depositing in Court, the specific bequests received by them under the will:

Because, a party holding the affirmative, (the Executors in the issue of probate,) is bound, fully, plainly and distinctly, to set forth his charge or allegation, (the grounds on which the will should be sustained,) that those holding the negative, may have notice of what they are called on to defend. And further, Because the point thus given in charge, was not plead by the Executors as being relied on as an estoppel to the heirs.

2nd, In charging, That a will was not utterly null and void, under the 4th section of the Act of 1818; because certain clauses in it might be for the freeing and manumitting of slaves—but the illegal clauses only:

Because, a will manumitting slaves, is not only void as to the clauses having that object, but is *utterly null and void.* *Act of* 1818, *Lamar's Digest,* 811, 4th sec.

3d, In charging, That the clauses of a will containing bequests of slaves and other property, to Executors as trustees for the use of the slaves, were not utterly void under the Acts of 1801 and 1818, unless it appeared to be the absolute intention of the testator, that the slaves should remain in Georgia:

Because, not only such clauses, but the whole will is void—whether the testator intended the slaves should remain in the

State or not; and if intended to go away, it should have been expressed in the will.    *Act of* 1818, *Lamar's Dig.* 811, *sec.* 4. ·

4th, In charging, That the bequest of slaves and other property, to the Executors of a will, as trustees for the use of the slaves, is not void, unless made with the absolute intention that the slaves having the beneficiary interest, should remain in this State. And that on such slaves going to a free State, they could hold the Executors accountable for the property held by them under such trust, and compel a surrender of the legal title :

Because, slaves cannot acquire any right, either at Law or in Equity, by devise, and such bequests being void by *our Statute,* no such claim could be enforced by reason of the slaves going to a free State.    *Act of* 1818, *Lamar's Dig.* 815, *sec.* 8.    *Wheeler on Slavery,* 6, 190, 191, 287, 387.

CHARLES J. JENKINS & ANDREW J. MILLER, for defendants in error, cited the following points and authorities.

1st. The Statutes of 1801 and 1818, were intended only to prevent the emancipation of slaves to remain in the State of Georgia.

No scheme of emancipation, connected with and dependant upon the permanent removal of the slaves emancipated from the State, is illegal.  *Dudley's Reports,* 170.    *R. M. Charlton's Reports,* 542.    *Acts of* 1801, 1818, *Prince,* 787, 795.    7 *Smedis & Marshall's Repts.* 663.    5 *Howard's Miss. Repts.* 305.    2 *Hill's Chan. Repts. S. C.* 304.

2d. In construing a will, the testator is to be presumed to have intended obedience, rather than disobedience to law.

The rational construction of Keith's will is, that he intended the slaves he proposed to emancipate, to be free in Georgia, if they could lawfully be so ; otherwise, that they should be sent where they could enjoy freedom.

3d. If the will admits of this construction, the whole will must stand.

If not—if the Court should be of opinion that the manumitting clauses conflict with the Statutes, then only those clauses are void, and the rest of the will is good.    3*d Sec. of the Statute of* 1801, *amended by* 2*d Sec. of the Statute of* 1818.    8 *East's Rep.* 231.    2 *Wilson's Rep.* 347.    8 *Term. Rep.* 411.    1 *Kelly's* 247, 405.

4th. The long acquiescence of the plaintiffs in error, after pro-

bate in common form, with knowledge that the Executors were proceeding to execute the will, and permitting them to remove the slaves intended for emancipation, should estop them from now bringing the will in suit. 1 *Williams on Ex'rs*, 194. 1 *Eng. Eccl. Repts.* 239, *& cases in note.*

5th. Legatees who have received legacies from the Executors, cannot be permitted afterwards to bring the will in suit, without bringing in and depositing the legacies so received. 1 *Williams, on Ex'rs.* 194. 2 *Eng. Eccl. Repts.*, 135, 514.

6th. The Court properly overruled the motions in relation to the pleadings; they being then amendable. *Rules of Superior Court.*

*By the Court.*—LUMPKIN, J. delivering the opinion.

In 1839, Marshall Keith, of the county of Columbia, duly made and published his last will and testament in the words following, to wit: "In the name of God, amen ; I Marshall Keith, of the county of Columbia and State of Georgia, do make this my last will and testament in the words following; that is to say, in the first place, I give and bequeath unto Joseph Jones, alias Keith, one negro girl now in Alabama, named Jane, together with her increase, to him and his heirs forever. Then I give and bequeath unto said Joseph and John Jones, alias Keith, all my property in Alabama, both real and personal; also, the crop or crops on hand at my death. I also give to the said Joseph and John, the following negroes now in Georgia; viz: Zach, and his sister Martha ; Jack, and his wife Aggey, together with all Aggey's children ; Deiley and her children, and Jim, together with the increase of the females, to them and their heirs forever. Item—I give and bequeath to Mary Jones, wife of Wm. Jones of Augusta, (Gin maker,) the land I purchased of John Wood; also the land I purchased of Shackelford and McNair ; also eighty acres of land, beginning at a planted rock, near a red oak stump, it being one of McNair's corners, running a northerly course with McKinney's line, a sufficient distance on said line, thence westwardly to Foster's old fields, to make the eighty acres; it being part of the land purchased of McKinney and adjoining McNair, which said land, I give to her and her heirs forever. Item—In addition to what I have given said Mary Jones, I give and bequeath the fol-

lowing negroes, viz : Malinda, and all her children younger than Martha ; Letha and her children, viz : Edmond, Sam and Matilda, also Ingraham, to her and her heirs forever; together with the increase of the females.   Item—I give and bequeath unto Judith Jones, alias Keith, all my lands not otherwise devised, lying on the west side of the road leading to Fury's Ferry, to her and her heirs forever.   Item—I give and bequeath to said Judith, the following negroes, viz : Jeffrey, Violet and her children younger than Shadrack, inclusive ; also Sauney, Eliza and her children, Billy, and Daphney and her children ; Jane and her children ; John, and Nelson and Esther; Aleck, and Isabella with her youngest child Athena, together with the increase of the females. to her and her heirs forever.

Item—It is my desire, that my servant Ishmael should be freed ; but if that cannot be accomplished, I give him to my Executors hereinafter named, in trust, for his own use, to go wherever he may please, and if it suits him to take with him, sell or dispose of, the property hereinafter devised to my Executors, in trust for said Ishmael ; he making in writing, application for that purpose, to my said Executors ; in which case, I do authorize my said Executors to sell all or any part thereof, the proceeds to be paid to him, the said Ishmael.   Item—I give to my Executors in trust, for the use of said Ishmael, one hundred and fifty shares of the Mechanics' Bank of Augusta.   I also give to my said Executors, in trust, as a home for the said Ishmael, and his sisters Minny and Elizabeth hereinafter named, all my land on the east side of Fury's Ferry road, to be under the sole direction and control of the said Ishmael; but should the said land be sold as above, it is my will and desire that Minny should receive one third of the amount of the sale.   I also give to my Executors in trust, aforesaid, for the use of Ishmael, the following, viz : Hannibal, Delila and her two children Ned and George, also, the blacksmith's tools ; choice of one cart and oxen ; choice of my horses, and choice of three mules ; also, corn, fodder and pork for one year ; also stock of cattle, sheep and hogs, as many as my Executors may deem necessary ; also, one bed and furniture ; all of the above property I give to my Executors, in trust, for the said Ishmael and his heirs, forever, with power to will the same.   I also give in like manner, to my Executors in trust for Ishmael, the following negroes : Boling, Robert and Green, children of yellow Agg, in like manne :

Vance *vs.* Crawford.

In order to prevent repetition, what I leave to Minny and Elizabeth, I leave in the same manner, as what I have left Ishmael, and I leave them in like manner in trust for their own use.  *Item*, I give to my Executors, in trust, for Minny and her heirs, one hundred shares of Mechanic's Bank of Augusta, a girl named Blanche, also Minta, also one bed and furniture, spinning wheel, and loom.    *Item*, I give in trust to my Executors in trust for Elizabeh, fifteen shares of Mechanic's Bank of Augusta, and one bed and furniture.    *Item*, I give to my brother Isham, in trust for my sister Susan for life, and at her decease to be divided among her children, one hundred shares of the Insurance and Trust Company of Augusta, the dividends to be paid to him or his attorney. *Item*, I give in trust to William Jones of Augusta, (gin-maker,) fifteen shares of the Mechanic's Bank of Augusta, for the use of James Jones, the dividends to be paid to the said Jones during his life, and at his death I give the same to the said William Jones, to him and his heirs forever.    *Item*, I give to my nephew, Tarlton F. Keith, fifteen shares of the Mechanic's Bank of Augusta, in lieu of his right of one-third of one-fifth of my mother's dower, negroes, in my possession, having purchased all the other parts, and the aforesaid one-third of one-fifth, being his proportion as one of the heirs of my late father, and in lieu of any claim which he may suppose he has against me.    *Item*, I give and bequeath to my niece, Judith Hibler, twenty-five shares of the Mechanic's Bank of Augusta, and at her death, I give the same to her children; also one bed and furniture.    *Item*, I give and bequeath to my niece, Harriet Vance, ten shares of the Mechanic's Bank of Augusta.    *Item*, I give to the Secretary of the Colonization Society, the following negroes, viz: Alfred, Daniel and Thornton, for the purpose of being sent to Liberia, and also five shares of the Mechanic's Bank of Augusta for each—the proceeds to be paid to them or the survivor, on their arrival in Liberia, and for no other use or purpose.    And as I leave it optional with them to go or not, should they or either of them refuse, I give him or them as follows : Alfred and Daniel I give to my Executors in trust, for the use of Ishmael—and also, the shares of the Mechanic's Bank given for them in Liberia.    *Item*, should Thornton refuse to go to Liberia, I give him and the aforesaid five shares, to Wm. Jones, (gin-maker.)

*Item.*—I give my servant Nancy in trust to my Executors for

her own use, charging her maintenance on her son Ishmael. *Item.*—I give my servant Ned, blacksmith, to my Executors in trust, for his own use, and also five shares of Mechanic's Bank for his maintenance, and at his death, I give the same to Ishmael. *Item.*—In further consideration, I give and bequeath to said Mary Jones, all the land purchased of McKenners on the east side of the road leading to Fury's Ferry, but the part of the 80 acres before mentioned, lying on the west side of said road, I give to Judith. I also give to said Mary a negro man named Ben, to her and her heirs forever. *Item.*—I give and bequeath to the aforesaid Judith, eight mules, one wagon, cart, and yoke of oxen, stock of cattle, hogs, and sheep, for her plantation, one choice of beds and furniture, one half-dozen chairs, one large table, sideboard and settee; also, corn, fodder, and pork, for one year, the gin on the plantation, and plantation tools. *Item.*—I give to Mary Jones five mules, one wagon, one yoke of oxen and cart, sufficiency of cattle, hogs and sheep for the plantation; also, corn, fodder, and pork for one year, plantation tools, &c. *Item.*—I give in trust to my Executors, for the use of said Ishmael and Minny, the residue of my furniture, excepting such chairs as John can take to Alabama. *Item.*—I give and bequeath to the aforesaid Joseph and John, one wagon and gear, and five mules to take negroes given them to Alabama, and it is my will that the expense of carrying said negroes, should be paid out of my estate. *Item.*—I give and bequeath to the aforesaid John, second choice of my horses, my gold watch, bed, and furniture, and as many chairs as he can carry to Alabama. *Item.*—It is my will and desire that the servants I have freed or left in trust, and the property to be sent to Alabama, should not be appraised. It is further my will and desire, that my Executors should not suffer those servants I have freed or left in trust, to live in, or within three miles of any town or village in Georgia or Carolina. *Item.*—I release to James Payne of Va. Isaac Stone of Alabama, and Isaac Hibbler, what they may be indebted to me at my death. *Item.*—After all my just debts are paid, I give and bequeath unto the sons of my brother James and my brother John, the residue of my property of whatever nature or kind soever, to them and their heirs forever, to be equally divided between them, or the survivors of them. And lastly, I do hereby appoint my friends, George Crawford, of Richmond, Junius

Crawford, of Columbia Co., Wm. Jones, aforesaid, of Augusta, and Turner Clanton, of Columbia, Executors of this, my last will. And I do further appoint Joseph and John Jones, aforesaid, my Executors in Alabama, hereby revoking all wills by me heretofore made.

In testimony whereof, I have hereunto set my hand at my page, and affixed my seal, this Eighteenth day of May, in the year of our Lord, 1839.                    MARSHALL KEITH, [L. s.]

In the presence of

JAS. G. STALLINGS,

ISAAC BRYAN,

W. C. BERRYHILL.

GEORGIA, COLUMBIA COUNTY :

In the Court of Ordinary, James G. Stallings, Isaac Bryan and Wm. C. Berryhill, the three subscribing witnesses to the within and foregoing instrument, after being duly sworn, upon the Holy Evangelist, depose and say that they were personally present, and saw the testator, Marshall Keith, in life, sign, seal, pronounce and declare the same to be his last will and testament ; that the testator was of sound and disposing mind and memory, at the doing thereof, and that they subscribed the same as witnesses thereto—all done at the request and in the presence of the testator, and in the presence of each other.

JAS. G. STALLINGS,

ISAAC BRYAN,

W. C. BERRYHILL.

Sworn to in open Court, this 3d day of January, 1842.

G. JONES, Clerk.

It will be perceived that the testator departed this life, without revoking, or in any manner altering said instrument, and that the same was duly proven by all three of the subscribing witnesses, and admitted to record by the proper Court, on the 3d day of January, 1842. Three of the four Georgia Executors qualified, namely, George W. Crawford, William Jones, and Turner Clanton, and proceeded immediately to execute the will. On the 28th of January, 1847, something upwards of five years after the probate of the will, Hibler and wife, Vance and wife, and Tarlton F. Keith, next of kin of the testator, called upon the Executors to produce the will of the deceased, and prove the same in solemn form, on the first Monday in March thereaf-

ter. Accordingly, the Executors appeared, produced the paper, and insisted that it was the last will and testament of Marshall Keith, deceased; they further urged that the persons at whose instance they had been summoned to prove said will in solemn form, were fully informed of the proof thereof in common form, acquiesced in the same, received legacies under it, and permitted the Executors to go on in the execution thereof without objection, for more than five years, until the estate was pretty well administered. Wherefore, they prayed that the said paper might be fully and wholly established, as the last will and testament of their testator.

The pro-movants, on the contrary, contended that this paper, purporting to be the last will and testament of Marshall Keith, deceased, was utterly null and void by the laws of the land, and in violation of the public policy of the State, the testator having attempted therein to manumit his slaves, which is expressly inhibited by the Statutes of Georgia.

The case being appealed by consent, to the Superior Court, was finally tried at the March term, 1848—His Honor, Judge Holt presiding—Tarlton F. Keith, one of the caveators, withdrew from the litigation. The Special Jury found a verdict for the Executors.

Various errors are alleged to have been committed during the progress of the trial, which it becomes our duty to consider.

[1.] 1st. A motion was made to exclude the defence of the Executors, on the ground that no notice was given of it to the opposite party. From the record before us, it would appear that the defence was regularly filed at the March term, 1847, of the Court of Ordinary, and that it had been transmitted by the Clerk of that Court, up to the Superior Court, with the other pleadings in the case. But grant that it was in fact filed intermediate the entering of the appeal and of the trial.* Under the Rules of Court, regulating amendments on the appeal, it was competent for the Court, in the exercise of its discretion, to have permitted the plea or protest of the Executors to be amended, even after the case was submitted to the Jury; and if the opposite party would state that he was taken by surprise, the Court would have continued the case at the instance of the amending party. No such motion was made; we must therefore overrule this objection.

2d. The caveators applied to have the second ground of de-

fence stricken out, for the reason that it was not pertinent to the issue.   That ground was, that the persons at whose instance the Executors had been cited, had for a long time acquiesced in the will, received legacies under it, and suffered the Executors, knowingly, to proceed in the execution thereof, without complaint, until the estate was almost fully administered.   The Circuit Judge refused this application, and this decision is excepted to.

[2.] We will state, succinctly, what we understand to be the law upon this point.   The next of kin, as such merely, are entitled of common right, to call for the proof in solemn form of the will of the deceased.   And the mere acquiescence of the next of kin, to the probate being taken in common form, is no bar to the exercise of this right, even though they may have received a legacy under the will.

[3.] And the time within which this may be done, is not, and from the nature of the case, cannot be very accurately designated. In England, it has been held that a will may be called in, and the probate contested, after a lapse of twenty years from the probate in common form.   *Sattewhite vs. Sattewhite,* 1 *Eng. Eccl. Rep.* 151. · *Timucan vs. Gayfer, Ib.* 425.   And Bacon mentions a case, when, after the lapse of forty years, the heirs of the deceased were permitted to contest the will.   The Legislature of Georgia in 1845, passed a Statute of Limitations upon this subject, and fixed upon seven years as the period after which this shall not be done, except in case of infancy.   *Pamphlet L.* 1845, *p.* 39.   But this proceeding must be determined by the law as it stood before that time.   And we would not be understood as expressing any opinion as to whether a party might not, even under the Statute, lose the right, under the peculiar circumstances of the case, before the seven years had expired.

[4.] I will now state what we conceive to be the qualification of the general doctrine just laid down, as to the right of heirs and distributees to the re-probate of the will.   Long acquiescence by the next of kin in the provisions of the will may, and in the opinion of this Court, does in the present case amount to such a waiver of their rights, as to preclude them from gainsaying the first probate, and putting the will again in suit, unless their delay is accounted for or excused by some special circumstance, as infancy, absence from the country, or such like disability.   1 *Wms. on Ex'rs,* 193, 194.   1 *Eng. Ecc. R.* 239.   2 *Ib.* 135, 514.

Vance *vs.* Crawford.

Has any such explanation been rendered by the next of kin on the present occasion? The record does not disclose any. On the contrary, the transcript before us establishes, that these heirs not only received legacies under the will, but from the contiguity of their residence, and other considerations, the conclusion is irresistible, that they were fully apprized of the provisions of the will. And after standing by for five years, and seeing the Executors, in the discharge of what they believed to be their duty, distribute the estate, by the payment of legacies, and the removal of the negroes, who were freed by the will, to the State of Ohio, whence it would be impossible to reclaim or recall them, now come forward at this late day, without assigning any excuse whatever for their tardiness, undertake to set aside the will *in toto*, and [5.] have the estate distributed, as in cases of intestacy; and that too without bringing back, or even offering to return the legacies which have been paid them by the acting Executors. To countenance such conduct would, in the opinion of this Court, be contrary to right and justice. All persons, naturally, seek to enjoy what properly belongs to them; and after remaining silent so long a time, the inference fairly deducible by the Executors from their neglect, was, either that they were satisfied of the validity of the will, or, if void, that they intended to relinquish any benefit which might accrue to them from its overthrow.

And having come to this conclusion, it saves us the necessity of deciding the other grounds, taken in the Bill of Exceptions, and pressed with most commendable zeal and ability by the counsel for the plaintiffs in error. And we are glad to be thus relieved, for the remaining questions involve matters of the greatest import.

[6.] As to so much and such parts of the will as authorize the emancipation of three of the testator's slaves in Liberia, we are clear that it was entirely competent for him to make such *post mortem* disposition of his negroes. Owners can, in their lifetime, carry or send their slaves to the coast of Africa to be colonized, or elsewhere, for the purpose of freeing them. And they can appropriate the whole, or any portion of the remainder of their property, if they so please, to their transportation and mainte- [7.] nance in their new homes. We hold it equally certain, that they can direct the same thing to be done by their Executors, after their death. *Foreign* emancipation neither conflicts with the letter or spirit of our municipal regulations relative to this subject.

On the contrary, it is in accordance with our declared policy. The colored population in the U. States in 1790, was 697,697. It is now nearly 3,000,000. It has grown from a molehill to a mountain. It has been the constant effort of our State, as declared in the strongest language, and seconded by the sternest penal enactments, to prevent the increase of this population. We believe that it is the interest of both races, that the number of blacks should not be augmented. But we must say, that we should find it extremely difficult to reconcile the other clauses in this will, to the settled and uniform policy of our Legislature, which forbids and rebukes, in the sternest terms, all attempts at domestic manumission, whether open or covert, directly or *in trust*; a policy too, which we hold to be founded in the most manifest wisdom and propriety. We need not dilate on this prolific source of mischief. We feel it to be an imperative duty to see to it, that the laws are not evaded, which have been wisely and studiously framed, to prevent the extension of the evil. Neither humanity, nor religion, nor common justice, requires of us to sanction or favor domestic emancipation; to give our slaves their liberty at the risk of losing our own. They are incapable of taking part with ourselves, in the exercise of self-government. To set up a model empire for the world, God in His wisdom planted on this virgin soil, the best blood of the human family. To allow it to be contaminated, is to be recreant to the weighty and solemn trust committed to our hands. Republican institutions cannot exist in Mexico, or the *commingled* races of South America. And while we concede that the condition of our slaves is humble, still it is infinitely better than it would have been, but for this very system of bondage, better than the lower orders in Europe, and better far than it would be, if they were emancipated here, "destroying others, by themselves destroyed."

It may not be unworthy of notice that we have a direct legislative expression of opinion, in support of both of the positions here assumed, viz : the impropriety of tolerating domestic manumission, which cannot fail greatly to corrupt the other slaves of the country, and to render them dissatisfied with their condition of servitude—leading in the end to insubordination and insurrection ; and on the other hand, that foreign colonization has in it nothing hostile to the peace and policy of the slave-holding States. The Act of the General Assembly of Georgia, passed in 1817, empowers the Governor to cause to be sold all negroes, mulat-

toes or persons of color, who may be brought into this State in violation of the Act of the United States, to prohibit the importation of slaves into this country, after the first day of January, 1808.   It is *provided,* however, in the *third Section,* that " if previous to any sale of any such persons of color, the society for the colonization of free persons of color within the United States, will undertake to transport them to Africa or any other foreign place which they may procure as a colony, for free persons of color, at the sole expense of said society, and shall likewise pay to His Excellency, the Governor, all expenses incurred by the State, since they have been captured and condemned, His Excellency, the Governor, is authorized and *requested to aid in promoting the benevolent views of such society, in such manner as he may deem expedient."   Prince,* 793, 794.

It will be perceived that the Representatives of the people, instead of condemning and repudiating foreign emancipation, as pregnant with mischief, more than thirty years ago affixed to this enterprise the public seal of commendation and encouragement. And this act of their Agents remains on the Statute Book, unrepealed by their constituents.

In conclusion I would remark, that great indulgence is extended to the declared wishes of testators, touching what they would have done with their property after their death.   If it be true, however, that *families* are the original of all societies, and contain the foundation and primitive elements of all other social institutions, and as such deservedly claim the front rank in the protection of Courts, *Wills,* which are calculated practically, to disregard and set at nought this divine ordinance, worth more than all that man in his wisdom has ever devised, cannot claim to be regarded with peculiar tenderness and favoritism by Courts of Justice.

Let the Judgment of the Court below be affirmed.