Sanders vs. Ward et al.

ELIZABETH SANDERS, caveator, &c., plaintiff in error, vs. B. F. WARD, et al. propounders, &c., defendants in error.

A will directing the executor, after the payment of the debts of the testator, which were small, and the estate, independent of the negro property, ample to discharge them, to remove the testator's slaves to some free State, to be selected by the executor, and there to set them free, is not contrary to the laws of this State, nor within the Acts of 1801 and 1818, prohibiting manumission *in this State*, except by the sanction of the Legislature.

Manumission of slaves by will, from Monroe county. Decided by Judge CABINESS, August Term, 1857.

Nathaniel T. Myrick, of Monroe county, on the 21st of June, 1856, executed his last will and testament; and after direction to his executors to pay his debts and funeral expenses, proceeded in the 2d and 3d items as follows:

"*Item Second:* I devise and bequeath, and require my executors hereinafter named, to remove my servants Owen, Elizabeth, Joseph, Samuel, William, Flora, George, Harriett and Leonard, to some free State, as my executors may choose and select, as they may deem proper, then and there to manumit and set them, my said named servants, free, to act for themselves, them and their heirs forever.

*Item Third:* My executors hereinafter named shall purchase in such free State as they may select, a parcel of land sufficient for the above named servants, with a supply of pro-

visions, household and kitchen furniture, farming utensils, horses or mules, cattle, hogs and sheep, with the money arising from the sale of my estate, as above directed, and shall pay over any surplus after paying for the removal aforesaid, land and other articles mentioned, to my servant Owen, to be manumitted aforesaid, each one to have and own an equal portion of said land and other articles to be purchased as aforesaid, and also an equal portion of the money remaining after the removal and settlement aforesaid."

To the probate of this will a caveat was entered by Elizabeth Sanders.

At the trial upon the appeal, the propounder of the will introduced in evidence the said will. To the admission of this paper in evidence the caveators objected on the ground, that all the witnesses to the said will had not been examined, nor had the failure to examine them been accounted for; and that the said paper so offered was illegal and in violation of the Statutes of the State against the manumission of slaves. The Court overruling the objection, admitted the will in evidence, and the caveator excepted.

The jury found for the will, and the caveator, by her counsel, moved the Court for a new trial on the following grounds :

1st. Because the Court erred in allowing the will to be read to the jury, before all the witnesses to it had been examined by the propounders, and before they had shown any reason why all the witnesses were not examined.

2d. Because the Court erred in allowing the paper to be read in evidence to the Jury, it being illegal and in violation of the laws of this State against the manumission of slaves, and against the public policy of this State.

3d. Because the Court erred in rejecting the evidence of Vincent T. Lassiter, who testified, that on the evening the testator made his will, on account of signs of stupor and weakness exhibited by testator, he remarked in presence of some of the negroes, that the testator never would make a will.

4th. Because the verdict of the jury is against the law and the evidence.

The Court refused to grant a new trial, and caveator excepted, and filed her bill of exceptions, assigning as error all the grounds taken in the motion for a new trial.

GIBSON ; and HAMMOND, for plaintiff in error.

PINCKARD ; and STEPHENS, *contra.*

*By the Court.*—LUMPKIN, J. delivering the opinion.

In the matter of Nathaniel T. Myrick's testament, we have examined the will, and find there is nothing in it to bring it within any of the exceptional cases decided by this Court ; and that the naked question presented for our adjudication is, whether, by the laws of this State, a testator can direct his executor to remove his slaves, after his death, to some free State, for the purpose of acquiring their freedom by the operation of the *lex loci,* and make provision for them in their new home? Is this forbidden by the Acts of 1801 and 1818?

In support of my opinion in favor of the negative of this proposition, I simply refer to the past decisions of this Court. I will not re-argue a point so often and so elaborately discussed.

My brother Benning refers to three positions occupied by him in the *Bledsoe Will Case,* and which he insists have never been answered, nor attempted to be answered, and which he deems impregnable.

The first is, that this case comes clearly within the words of the law ; secondly, that the policy of preventing domestic emancipation is best and most effectually subserved by prohibiting all emancipation whatsoever ; and thirdly, that there can be no *exterior* which is not necessarily preceded by *domestic* emancipation.

' All three of these positions have been incidentally, if not formally, again and again considered by this Court, and we

had supposed the argument pretty well exhausted upon each. I propose, however, briefly to notice each of them in their order.

1. That clauses can be found in one or both of the Acts referred to, broad enough, *perhaps*, to embrace foreign as well as domestic manumission, may be conceded; but taking the whole of each Act separately, or both together, I demur to the proposition, that extra-territorial emancipation is included in the words of either of these Acts.

What was the object of the Act of 1801? Its title discloses. It was an "Act prescribing the mode of manumitting slaves *in this State!*" Cobb, 983. Here, then, we meet with a stumbling block upon the very threshold of the discussion.

Instead of being an Act to prohibit manumission, partial or total, at home or abroad, it is simply an "Act prescribing the mode in which" it shall be done "*in this State!*" And right here arises a dilemma. The title of the Act, specifying as it does, that it was passed to prescribe the mode of freeing negroes *in this State*, and for no other purpose, if it contains any matter different from this, that is, the matter contended for on the other side, namely, a prohibition against foreign emancipation, it is unconstitutional and void. XVII*th sec.* 1 *Art. Cons. St. Ga. Cobb*, 1114.

But the Act is valid. Read it in the light of its title, and to its title it must be restricted; and the foundation upon which my brother's first position rests, so far as this Act is concerned, is entirely swept away.

I have said there is no repugnancy between the title and the body of this Act. The first section declares that slaves can only be manumitted by the Legislature. I ask, can it be doubted that any master in the State, notwithstanding this section, has the right to remove to New York, or any other free State, and take his slaves with him, and thus by operation of law, secure to them their freedom? No one has ever expressed or intimated such an opinion. The first section,

Sanders vs. Ward et al.

then, does not forbid foreign emancipation by the master in his lifetime.

The second section provides a penalty for a breach of the Act, and amongst other things declares, that any slave set free, contrary to the meaning of the Act, shall still be, to all intents and purposes, in a state of slavery. Did the Legislature of 1801 design to render themselves ridiculous, by the promulgation of a *brutum fulmen*, that slaves set free by their removal to a free State, should still be, in a state of slavery? Such an imputation would be disrespectful to that body.

The third and last section makes it penal for officers to record any deed, or other instrument, which shall have for its object the manumitting or setting free any slave. As no deed was necessary to confer freedom on slaves, by transferring them to a free State, foreign emancipation could, of course, be effected by the master in his lifetime, without incurring the penalties of this Act. *Wills* are not designated in this section by name, still, the words are broad enough to include them; and it is in accordance with the whole object of the Act to construe it to apply to wills. And if no will can be recorded which confers freedom abroad, there can, of course, be no such thing, for the will gives no authority to the executor to act, until proven and admitted to record by the proper tribunal. But this section must be construed in reference to the rest of the Act; for it is one of the means provided for its observance. The language of this section must be limited to the purpose for which the law was passed; and that, as we have seen, was to prescribe the mode of manumitting slaves *in this State*, which is by the Legislature, and to make it penal to do it in any other way.

So much then, for the present, for the Act of 1801. We shall have occasion to advert to it again before closing these remarks.

The Act of 1818 was an "Act supplementary to, and more effectually to enforce the Act of 1801." *Cobb*, 989.

We have seen, that by the third section of the Act of 1801,

no *instrument* could be recorded which gave freedom to slaves *in this State*; and it was very naturally interpreted to extend to the whole deed or will. But in the second section of the Act of 1818, it is declared that the third section of the Act of 1801 shall be construed to extend to inhibit the recording only *so much* of any instrument as relates to manumission. Here, then, is a legislative declaration against too latitudinary a construction of the language in the third section of the Act of 1801.

And yet it would seem that to make the whole instrument void, would have been a very efficacious mode of preventing a violation of the Act. But suppose the Courts of the State had construed the third section of that Act to inhibit foreign emancipation, when the fell demon—abolitionism—had not reared its monster head to menace the land, and when six years after, as their resolution shows, the Legislature had not abandoned the idea of prospective and ultimate emancipation, and when they were passing resolutions laudatory of the American Colonization Society, who doubts that the General Assembly, at that day, would promptly have negatived any such interpretation of the Act of 1801, as is sought now, for the first time, to be put upon it? No; it is a modern thought, obviously and unquestionably suggested by the state and change of the times, and not by the Act itself.

The Act of 1818 was intended to accomplish a two-fold purpose; to extend the Act of 1801, and to prevent evasions of it, by what may be denominated fraudulent manumission. That is, by allowing persons of color the full exercise and enjoyment of all the rights of free persons, and yet who never have been manumitted in conformity to law, and without being subject to the duties and obligations incident to such persons. Against this state of things the Act of 1818 is partly directed.

The preamble to the Act recites, that "Whereas the principles of sound policy, considered in reference to the free citizens of this State, and the exercise of humanity towards the

slave population within the same, imperiously require that the number of free persons of color within this State, should not be increased by manumission, or by the admission of such persons from other States to reside therein :   And whereas, divers persons of color, who are slaves by the laws of this State, having never been manumitted in conformity to the same, are nevertheless in the full· exercise and enjoyment of all the rights and privileges of free persons of color, without being subject to the duties and `obligations incident to such persons, thereby constituting a class of people, equally dangerous to the safety of the free citizens of this State, and destructive of the comfort and happiness of the slave population thereof, which it is the duty of this Legislature, by all just and lawful means, to suppress."

Here, again, as in the title to the act of 1801, we are impressed with the one single definite object in contemplation of the Legislature, namely the evils of domestic manumission, actual and colorable, and the mode of preventing it. Not only is this one thought uppermost in their mind, but none other seems ever to have entered their imagination, or been even conceived of. My brother says he has no prejudice against free negroes, and thinks they constitute a very convenient class of our population.   And he is not singular in this opinion.   But we are sitting here merely to expound and enforce the legislative will, and not our own.   And there can be no contrariety of conclusion in reading these acts, that the Legislature entertained a very different view of the matter.   They looked upon free negroes in our midst as a great nuisance, and were determined by the most stringent enactments to prevent the increase or multiplication of this mischief.

While this idea is put forth so prominently, throughout these statutes, it is equally remarkable that no allusion is made in any one line, or word, or syllable, in either of these Acts, to foreign emancipation; and yet, after a universal acquiescence of the people of the State, for more than a quarter of a

century, as to the true and only meaning of these Acts, it is now discovered for the first time, that they contain a prohibition against extra-territorial emancipation! This difference of opinion, upon a point which appears to me too plain and palpable to admit of doubt, has done much to humble my pride of opinion, and to teach me patience, even when men deny the existence of matter; that man can hold property in man; contend for the immaculate conception of the Virgin Mother; or any other philosophical, political or religious dogma.

In the first clause of the 4th section of the Act of 1818, we find broader terms used than in the 3d section of the Act of 1801. In the latter it is merely declared unlawful for the Clerks of the Superior Courts, or any other officers of the State, to enter on record, in any book of record kept by them, any deed of manumission or other paper which shall have for its object the manumitting or setting free of any slave or slaves; whereas, in the first clause of this 4th section of the Act of 1818, it is declared that all and every will and testament, deed, whether by way of trust or otherwise, contract, agreement or stipulation, or other instrument in writing, or by parol, made and executed for the purpose of effecting or endeavoring to effect the manumission of any slave or slaves, either directly, by conferring or attempting to confer freedom on such slave or slaves; indirectly or virtually, by allowing and securing, or attempting to allow and secure, to such slave or slaves, the right or privilege of working for his, her, or themselves, free from the control of the master or owner of such slave or slaves, or of enjoying the profits of his, her, or their labor or skill, shall be, and the same are hereby declared to be utterly null and void.

It will not be disputed, that if you take this part of the section only, the words of the Act are broad enough to cover the will before us, and all others conferring freedom, whether foreign or domestic. But the fallacy of the proposition which I am endeavoring to combat, consists in its being based

upon one clause of the statute. Is it legitimate to do this? To take one clause, or even section of a statute, one item of a will, or any other instrument, and construe it apart from the context? Such a mode of interpretation is inadmissible. You must construe every contract, constitution, and every other instrument, as a whole. It was the *fool* that said in his heart, "There is no GOD." And yet leave out the context, the first part of the first verse of the 14th chapter of Psalms, and you can prove by the Bible itself, "there is no GOD."

And this is the rule of common law as well as of common sense. "The intent of the Legislature," said C. J. Best, "is not to be collected from any particular expression, but from a general view of the *whole* of an Act of Parliament." 4 *Bing. R.* 196.

Before reaching the end of the 4th section of the Act of 1818, beginning with the general terms which I have quoted, we find a provision, that the slaves attempted to be freed, in contravention of the terms of that Act, are made liable to be arrested by warrant, and sold as slaves at public outcry. The Legislature had in contemplation, of course, slaves remaining as freemen, or *quasi* free, in the State. But when we reach the 10th section of the Act, all doubt vanishes as to the meaning of the Act. It requires Courts of Justice to construe the Act of 1818 according to the true intent thereof, " *as declared in the preamble,*" and not according to our present notions of policy, resulting from our angry collisions with the North, respecting this institution. That is to say, the Courts of Georgia are to give to this Act such an interpretation as will prevent the increase of free persons of color within this State, either by manumission, open or colorable, or the admission of such persons from abroad.

Taking the whole of either of these Acts, then, or both together, I do insist most earnestly, that foreign emancipation is neither within the letter or spirit of the law.

And when we look to cotemporaneous history, the evidence

is overwhelming, that no such meaning was intended. Had the entire State been polled in 1818, ten men would not have been found opposed to foreign manumission. Wm. H. Crawford, who decided on his circuit, and afterwards in convention of the Judges, in the *Bradley Will Case*, that emancipation in Liberia was not forbidden by the Acts of 1801 and 1818, was a practicing and prominent lawyer, and if I mistake not, a member of the Legislature in 1801. He was familiar with the condition of things and of public opinion at that period, and he and his compeers repudiated the forced construction now attempted, for the first time, to be put upon the Acts of 1801 and 1818. The North and South had not been arrayed at that period in hostile antagonism to each other, touching African slavery. If this change of circumstances demands a new policy to be introduced—and for myself I think it does—let it, as I have said and written again and again, be inaugurated by the Legislature, and not by the Courts.

All writers on law, national and municipal, hold the same language, that the great aim should be to discover what the law-maker meant; never to lose sight of that object, and to give it effect, whatever may be our opinion of its wisdom or policy. "Whatever doubts I may have in my own breast," said Lord Mansfield, in the case of *Pray vs. Edie*, 1 *T. R.* 313, "with respect to the policy and expediency of this law, yet, as long as it continues in force, I am bound to see it executed according to its meaning." And so say I with respect to the Acts of 1801 and 1818.

I dismiss this head of the discussion with this remark, that looking to the title of the Act of 1801, and the preamble and 0th section of the Act of 1818, as well as the entire Acts themselves, no one can mistake the design of the Legislature in passing these Acts.

2. My brother Benning's second position is, that if it be the policy of the State to prohibit domestic manumission, it is best subserved by forbidding all emancipation; inasmuch

Sanders vs. Ward et al.

.as some of the slaves sent abroad, occasionally get back. And it is probably true, that some half dozen or less, liberated abroad, have returned to the State. But in all candor, is it allowable to put such a construction upon the Acts of 1801 and 1818, or to cut off the right so highly prized by a large portion, *if not a majority* of our people, to guard against the return of a few straggling negroes? And that, too, when the Act of 1818 itself contains the most ample and stringent provision against free persons of color coming into the State; inflicting a penalty of $100, to be renewed every twenty days while they remain, and subjecting them to be sold as slaves if the fine is not paid? Can any thing more be needed? Can the Legislature be supposed to have looked to any other means as a protection against this evil?

I have said that it is by no means certain that a majority of our people are in favor of depriving themselves of the right of sending their slaves abroad, to be liberated at their death. The decision on *Bradley's Will* was made and published in the newspapers of the day, at the seat of government, during the session of the Legislature, some quarter of a century since. Its legality has been repeatedly sustained by Circuit Judges, as well as by this Court ever since its organization. No other decision has been so widely circulated and universally known. It has been acted upon by testators throughout the State, again and again. During the session of the Legislature before the last, I addressed a communication to the eminent counsel who argues so earnestly against the validity of this will, and who was at that time chairman of the Senate's Judiciary Committee, calling his attention to this subject, and suggesting the propriety of passing a law forbidding all *post mortem* manumission. Were I a legislator, I should vote for such a bill. So many unforeseen obstacles arise, that it is far better that the master should, during his lifetime, consummate his scheme as to the future disposition of his slaves. From some cause or other, my friend took no action upon the matter. I have been informed by a distinguished Rep-

resentative of the House, that a bill was introduced in the other branch of the General Assembly, and *voted down by an overwhelming majority of that body.* I have not consulted the journals, but take it for granted the statement is true. Is it for the Courts, then, to inaugurate this new policy, or to be forever importuned and harrassed with this subject, at each change of incumbents upon this Bench? I trust the question will be considered as settled, until the Legislature see fit to intervene. Let that body speak, and no one will take more pleasure than myself in obeying their behest. Sworn as I am, not to make but to administer the law, I never can torture the law, as it now stands, to a purpose for which *I know* it never was intended.

3. The third and last ground is, that there can be no *exterior* emancipation which is not preceded by domestic emancipation.

On the contrary, the very act of directing slaves to be carried out of the State, presupposes that the dominion of the owner continues. As freemen, they could not be removed. They can only be forced out of the State as slaves. In making wills of this kind, testators need not say a word about bestowing freedom upon their slaves. They have only to direct their executors to send or carry their slaves to some free State, without even calling it such, and there make such provision for them as they may see fit. And their slaves acquire their freedom by operation of the *lex loci,* and not by the will of the testator. They can acquire it in no other way. And their bonds remain until removed by the law of their residence. If I direct my slaves to be carried to New York, there to remain, they are slaves until they reach the free State, and they then become free; not by virtue of my will, but by the laws of New York. The third proposition is utterly untenable.

Again, suppose a testator bequeaths his slaves to Stephen A. Douglass of Illinois, or Rufus Choate of Massachusetts, and says no more; does not the bondage of these slaves con-

tinue until they set foot on the soil of their new home? And yet do they not acquire their freedom *eo instanti* they pass the boundary line of these free States *animo remanendi?* Are they freemen in Georgia? Does exterior manumission depend upon domestic emancipation as a condition precedent to its taking effect in this case? Could not these legacies be recovered in any of our Courts? And yet, a gift of the slaves to the executor, to be removed to Illinois or Massachusetts stands upon the same footing precisely. It is needless to extend this argument; the doctrine cannot be maintained.

But it is argued that the will of the testator cannot be authoritatively enforced, inasmuch as slaves, as such, cannot sue to have the will executed. Concede this to be true. it does not negative the right. A trust may be valid, and yet the trustee neglect or refuse to execute it. It is an old and exploded dogma, that there can be no right without a remedy. It is a confusion of ideas so to hold. A person is employed by the government to erect a State House; has he not a right to be paid? still he cannot coerce payment.

This suggestion has been urged again and again, in connection with the point under consideration, in all the slave States—in Alabama, Mississippi, South Carolina, Virginia, as our past decisions show—and has been invariably overruled. Trustees are selected by the testator, on account of the confidence reposed in them, and usually they will discharge their duty. And if there be doubts, they will apply to the Courts for direction. However faithless we may be to the living, we are rarely so to the dead. If the heirs move in the matter, this will give the Courts jurisdiction, and they will compel by their decree an execution of the trust. How many trusts of this sort all over the slave States, and in this State, have been executed? Have any failed for want of fidelity in the trustee? This objection is imaginary.

It has been triumphantly asked, not by my brother Benning, that if the Legislature were to re-enact the statute of

1801, without more or less, and this were *res integra*, could there be any doubt that it would be held to exclude every species of manumission? "An act prescribing the mode of manumitting slaves *in this State!*" For myself I am ready for the question. And I do not hesitate to declare that I should construe it just as I now do; and as all other Judges have done, from its first passage. Otherwise I should feel bound for the reasons already assigned, to pronounce the act unconstitutional.

The act, in conformity with its title, declares that it shall not be lawful to set free a slave in this State in any other manner than by an application to the Legislature for that purpose, and then provides the means for enforcing obedience to its provisions.

Of course all applications to free negroes at home must be made to the Legislature; for so the act prescribes; and it is all it does do. It is not pretended that it interferes with the right of a citizen, while living, to emigrate with his slaves, whenever he sees fit. Any attempt to abridge this right would produce revolution and depopulate the State. The attempt will never be made to control the right of ex-patriation, locally or nationally. These two propositions then not being debatable, can it be seriously contended that in order for a master to send his slaves abroad, that they may become free, it is necessary, under the act of 1801, to receive the previous sanction of the Legislature! The right to make a will accrues at seventeen, in males, and lasts till death, whether that event happen sooner or later. During this interval great changes take place in one's plans and purposes, condition and circumstances. At one time single, at another, with a family; at one period of life rich, at another, poor; and yet under these ever shifting circumstances, the owner of slaves must, in anticipation of a scheme not, perhaps, fully formed in his own mind, apply to the Legislature for leave to send his negroes out of the State, to the North, or Northwest, or Africa, Mexico—a *much better country* for them than any other free

State—at his death! Most wills too are made *in extremis.* It is the last act that most men do. It is postponed with most persons as long as possible. And yet knowing that it is appointed unto all men once to die, and the event, although certain to happen, yet contingent as to time and place, the people must crowd the Halls and time of the Legislature with discussions as to the propriety of allowing A. B. & C. to send off their slaves at their death! And even then, in addition to the public agitation of the subject, the slaves, under such an act, might in many instances, remain in our midst for half a century before the will would take effect by the death of the testator!

It is needless to multiply difficulties. The act of 1801, whatever else it may mean, was never intended to require the previous sanction of the Legislature to the foreign manumission by will, of slaves. The truth is, the Acts of 1801 and 1818, mean just what the Courts have heretofore uniformly held they did mean, and nothing more nor less, and that is, to forbid the setting free *negroes in the State,* directly or indirectly, actually or secretly, without the permission of the Legislature. Leaving slave holders to remove them during their lifetime, or to direct it to be done by their executors, after their death, just as they could before, from the colonization of the Province in 1732, down to that date.

My brother Benning says, that if the question admits of the least doubt he would yield to the unbroken current and concurrence of authority upon this point. But that if all the Courts in the State had declared, and were still to rule, that a creditor could collect 20 per cent. interest from his debtor, when the statute declared he should only be entitled to 7 per cent., and that all beyond this was usurious and void, it could not make it the law, nor would it be obligatory upon him.

I submit to the sober second thought of my brother, whether this illustration be fair? Whether it can be imputed to the men who decided the *Bradley Will case,* Crawford, Law, Holt, Lamar, Dougherty, Strong, Thomas, Warren, Hooper

and Warner, could have been so stupid as to have missed the mark in a matter so plain? Whether all the Judges in the State have followed blindly these blind guides? Whether Sharkey, of Mississippi, Chilton, of Alabama, and their illustrious associates, have stumbled upon a proposition so plain, that the fool and way-farer could not err therein? Whether these and all the great Judges of all the other slave States, in construing statutes, not only similar to our own, but some of them, as was shown by this Court in *Cleland et al. vs. Waters,* (19 *Ga. Rep.* 35,) couched in terms much broader than ours, could have erred so grossly and egregiously in a matter so self-evident as that 7 per cent. did not mean 20 per cent.?

For myself, I repeat, 1 have no partiality for foreign any more than domestic manumission. I believe that policy, as well as humanity for the negro, forbid both. Especially do I object to the colonization of our negroes upon our north-western frontier. They facilitate the escape of our fugitive slaves. In case of civil war, they would become an element of strength to the enemy, as well as of annoyance to ourselves. But what of all this? Shall I therefore undertake, by my individual opinion, to dictate to more than a half a million of my fellow-citizens, what shall be the law, by wresting these ancient statutes from what I believe to be their true and only meaning? A construction adhered to without variableness or a shadow of turning for a quarter of a century? Such is not my understanding of my duty or privilege.

Forbearing, as I have done, to re-argue the main question for the reasons stated at the outset, I am content, for the present, with these few observations, upon the points made by my esteemed colleague, in dissenting from the judgment of the Court in this case. I do not flatter myself to believe that he will consider it an answer to his three propositions. He cannot say, at any rate, that no *attempt* has been made to answer them.

McDONALD, J. concurring.

The only matter of difficulty with the Court grows out of the emancipation clause in the will. The testator requires his executors to remove certain named slaves to some free State and there to manumit and set them free. They are not freed by the will except through the instrumentality of the executors. They cannot, by the will, enjoy freedom for a single moment in this State, and this Court availing itself of the great power of all Courts to construe statutes according to their supposed reason and spirit, has held repeatedly, that extra-territorial emancipation is not prohibited by the acts of 1801 and 1818. I am free to say that if the question were before the Court for the first time, I should be strongly inclined to hold, that, by the act of 1801 on this subject, the Legislature intended to make itself the judge, in every case, whether the desired emancipation, be it intra-territorial or extra-territorial, contravened the existing policy of the State. I do not think that the act of 1818 changes, in the slightest degree, the provisions of the act of 1801 in that respect. Prior to the act of 1818 there had been evasions of the act of 1801, which it was the object of that act to prevent. I yield my own strong impressions to the contrary, to the repeated adjudications of this Court, conceding that there are good reasons for the decisions which have been made.

BENNING, J. dissenting.

The second item of the will is as follows: " I desire, and bequeath, and require my executors hereinafter named, to remove my servants, Owen, Elizabeth, Joseph, Samuel, William, Flora, George, Harriet, and Leonard, to some free State, as my executors may choose and select, as they may deem proper, then and there to manumit and set them, my said named servants, free, to act for themselves, them, and their heirs, forever."

All the rest of the will, with slight exception, is subservient to the purpose intended by this item.

Is this will void? That is the question.

In my opinion, the will, with the exception aforesaid, is void.

·The reasons which I have for this opinion, were fully expressed by me, in *Adams vs. Bass*, (18 *Ga.* 147,) and in *Cleland vs. Waters*, (19 *Ga.* 65.)· Those reasons have been in print for some time; during that time, similar cases represented by lawyers of the first ability, have been before this Court, yet, I have heard nothing which ought, as I think, to shake my confidence in those reasons.

Those reasons consisted chiefly in three propositions with what was offered to prove them. These propositions with this offered proof, I will briefly re-state, and then, I will notice what I have heard in answer to them.

1. The *letter* of the act of 1818, relating to manumission, declares every such will as this, void.

The words of the act are, " All and every will and testament, deed, whether by way of trust or otherwise, contract, agreement, or stipulation, or other instrument in writing, or by parol, made or executed· for the purpose of effecting or endeavoring to effect, the manumission of any slave or slaves, either directly, by conferring, or attempting to confer, freedom on such slave or slaves, indirectly or virtually, by allowing and securing, or attempting to allow and secure, to such slave or slaves, the right or privilege of working for his, her or themselves, free from the control of the master or owner of such slave, or slaves, or of enjoying the profits of his, her, or their labor or skill, shall be and the same are hereby declared to be utterly null and void." *Cobb Dig.* 991.·

A will "for the purpose of effecting" "manumission" out of the State, is a will "for the purpose of effecting" "manumission." And the *letter* of the act is, that "all and every will" "made" "for the purpose" "of effecting" "the manu-

mission of any slave, or slaves," "shall be" "utterly null and void." Therefore, the *letter*, declares this will, to be utterly null and void.

This is the first of the three propositions, with the proof.

2. To follow the *letter* of the statute, and hold such a will as this, void, is the best possible way of accomplishing the *spirit* of the statute.

Admit the spirit of the statute to be, to prevent the increase of free persons of color in the State.

Now a will has either to be held, void, or it has to be held, valid, one or the other. Therefore, if to hold such a will as this, void, is a better way, to prevent the increase of free persons of color in the State, than to hold it valid, is, then to hold it, void, must be the best possible way of accomplishing the *spirit* of the statute.

A way that is sure to accomplish an object, is a better way of accomplishing the object, than a way that is not sure to accomplish the object.

To hold such a will as this, void, is a sure way to prevent it from increasing the number of free persons of color in the State; to hold it, valid, is not a sure way to prevent it from increasing their number in the State.

To hold it void is to say, that the negroes it would manumit, remain slaves still and go to the heirs of the testator, persons who, it is manifest from their caveat, will, if they get the negroes, be desirous of keeping them in slavery. And it is impossible, that slaves can become free persons, if their owners desire to keep them slaves. " The Legislature shall have no power to pass laws for the emancipation of slaves, without the consent of each of their respective owners, previous to such emancipation." *Art.* 4, *Sec.* 9, *Cons. Ga.*

It is true, then, that to hold such a will, void, is a sure way of preventing it from increasing the number of free persons of color in the State.

To hold such a will, valid, is a sure way to *increase* the number of free persons of color in the State, for a time.

The negroes intended to be manumitted by such a will, must remain in the State for a time, after the testator's death. They must remain there until probate of the will and payment of the debts. During this time, they must, I say, be free persons; they cannot be slaves, for their rights vest in them, on the death of the testator, and where rights begin, slavery ends. A slave is a chattel to all intents and purposes whatsoever. "Negroes," "mulattoes," "shall be taken and deemed in law to be chattels personal in the hands of their respective owners or possessors, and their executors, administrators, and assigns, to all intents and purposes whatsover." *Act of* 1770, *Sec.* 1, *Cobb Dig.* 971. A chattel can have no rights.

To hold the will, valid, then, is to say, that the negroes become free persons, and that as such, they are to stay in the State, for a time.

This, therefore, is a sure way to make the will *increase* the number of free persons of color in the State, for a time.

It is a way that may make the will increase their number for all time.

The negroes being free in the State, for the time, the executor may consent to their remaining free in the State, for all time. To consent to this, is not to expose himself to any suit or risk; and the affair is one confined to him and the negroes. The will having been held valid, the heirs of the testator are barred, much more are strangers.

To hold the will valid, then, is to make it increase the number of free persons of color in the State, for all time, provided only, the negroes can buy, or beg, or otherwise procure, the consent of the executor, to their remaining in the State, for all time.

Indeed, it is far from clear, that the negroes will not have the power, if not the right, to remain in the State for all time, even without the consent of the executor.

The negroes becoming free for a time, does it not follow, that they become free for all time? May we not say, once a

freeman, always a freeman.  What process has the law, for
turning a free man into a slave ?

If then, it be true, that the law has no process by which
the freed negroes may be turned back into slaves, even al-
though they remain in the State, it follows, that if they do
remain, they will, for all time, increase the number of free
persons of color in the State.

And may they not remain if they please.  It is true, the
will requires the executor to remove them to a free State.
But does this give him the right to remove them against
their wish ?   The going to a free State, is a thing for *their*
benefit—and *quilibet potest renunciare juri pro se introducto.*
And supposing it does—how is he to enforce the right ?
There is no writ by which, one freeman can take another
freeman and put him out of the State.   The executor, then,
cannot enforce the right by law.   His physical power, there-
fore, is all that is left him to resort to, and this, it will gener-
erally happen, will be, as the physical power of one, to the
physical power of many.

Is it not true, then, that it is a doubtful question, whether
the negroes will not have the power, if not the right, to re-
main in the State for all time, even without the consent of
the executor ?   I think so.

But suppose the negroes all to have been, some how, re-
moved into the free States, what is to prevent them from re-
turning ?   Penalties ?   A feeble barrier.   Already one or
more of the negroes manumitted by the *Waters Will* (19 *Ga.*
65,) have returned from Liberia—a feat far more difficult,
than the return of such negroes from any one of the free
States.   And what is more, public opinion, as far as I can
judge of it, welcomes their return.

It is not only true, then, that to hold such a will as this,
valid, is a sure way to make it add temporarily to the num-
ber of free persons of color in the State ; but it is further true,
that to do so, is a sure way to make it give chances for addi-
tions to be permanently added to their number.

Therefore, I say it is true, that, to follow the *letter* of the statute and hold such a will as this, void, is the best possible way of accomplishing the *spirit* of the statute.

So much for the second of the propositions, and its proof.

3. When the *letter* of a statute, says, that a writing shall be void; and when, to hold it, void, is the best possible way of accomplishing the *spirit* of the statute, Courts are bound to hold the writing void.

To say the contrary, is to say, that Courts are not bound by law; for if the *letter* of a statute, when backed by the *spirit* of the statute, is not law, nothing can be law.

Thus, then, I have re-stated the three propositions with the proof. And the general conclusion, to which they lead, is, that Courts are bound to hold such a will as this, void, if Courts are bound by law.

I remark, that I have rested these propositions on the Act of 1818, but that I could just as well have rested them on the Act of 1801. The propositions derive equal support from both Acts.

Now what have I heard, in answer to these propositions? A denial of any of them? Never. I have heard two things, in answer to them.

Of these, the first may be thus stated: A man, while alive, may himself, carry his slaves to a free country, and so liberate them there; whatever a man may himself do, while alive, he may, by will, authorize an executor to do, after his death.

To this, I reply, that a man cannot authorize any thing to be done by a will that is void, and, that a will for effecting emancipation even out of the State, is, as we have seen, a will that is void.

The second, is, *decisions;*—a decision made by a Superior Court in 1830; (*Dudley R.* 170;) and several decisions of this Court, made within the last ten or a dozen years.

To this I reply, first, that if the three propositions are true, these decisions were wrong; for they are decisions directly

repugnant to two statutes—the said statutes of 1801, and 1818.

Secondly, I say that they are decisions which have met with nothing but rebellion, and that continually; witness the ever recurring caveats to wills giving any kind of manumission.

Thirdly, I say, that they are decisions of which the first was made before the anti-slavery sentiment had quite left us; and that the others are decisions which, as I persuade myself, merely followed the first, being made on the notion, that a precedent is to be followed, not questioned; and I say, that decisions made on that principle, cannot have as much authoritative force, as decisions made on the principle, that law is to be followed, even although a precedent has to be questioned. An echo is not entitled to rank with an original sound.

The question, then, becomes this, are Courts bound to follow decisions that are wrong ? Rather a startling doctrine; but it is nevertheless, one which I must admit has, at least, has had, a place in the law. On it rest, common recoveries, for one thing. *Communis error facit jus;* so it is said. But then, I ask, what is *communis error* ? And, I answer, that it is an error which must have been living and growing for a long time, so that it has its roots running and spreading every where in the community, and to tear it up, would be, to tear the community up with it. Is the error of these decisions such an error as this ? Surely not. Its beginning was within less than thirty years ago; its few repetitions were quite recent—within the last dozen years; it has not a root running out into the community, for the beneficiaries of it, having gone abroad to the emancipation there prepared for them, have ceased to be a part of the community. Correcting the error, therefore, would not touch anything held by the community. True it may be, that correcting it would be disappointing expectation in the case in which the correction was made, and possibly, in some few others, those

coming into existence at about the same time with that case; but this would happen, if the decision were not a decision correcting an error, but were an original decision. It must happen, that a first decision will disappoint one side or the other.

I do not think, then, that Courts are bound to follow these erroneous decisions.

Thus, I have said what I proposed to say.

The result is, that I find myself where I was. Therefore, I must still consider the manumission part of such a will as this, void, and, consequently, must dissent from the judgment of the Court.