Moses P. Green, executor, plaintiff in error, *vs.* John Anderson, defendant in error.

1. When a testator, who died in 1853, by will, directed that his executors cause to be removed to a free State, and *there* emancipated, his negro boy John, and that the executors pay the expense of his removal, and for his reasonable support and schooling, until he is put to a trade, and when, if he do, he reaches the age of twenty-one years, they invest and secure, for his benefit, as they may deem best, the sum of three thousand dollars, to be raised out of the estate: *Held,* that such devise constituted a legal trust, which neither contravened the policy of the State at that time, nor the present time.

2. It was the duty of the qualified executor, to execute this trust, and his failure to do so, till after John was twenty-one years of age, and his detention in Georgia, as a slave, by the executor, did not destroy the trust, or prevent its execution at a later period. Equity considers that done which ought to be done, and directs its relief accordingly.

3. Slavery having been abolished in Georgia, and freedom having come to John, when he was not permitted to go to it, as directed by the will, and promised by the executor when he assumed the trust, he being *sui juris* with the right to litigate, in the Courts of this State, may, in his own name, (as he is over twenty-one years of age), proceed in a Court of equity, to compel the execution of the trust, in accordance with the will, or as nearly so as the changed condition of the country will permit, and to recover, not only the legacy, as provided by the will, but such reasonable compensation, for the support and education, which the will gave him, as the Court may find due and unpaid.

4. While a freedman may, in the Courts of this State, enforce any legal equity which was created in his favor, while a slave, that did not then contravene the policy of the law, he can not maintain an action for injuries which he may have received, or for wages on account of labor done by him, while he was a slave.

Manumission. Emancipation. Decided by Judge Gibson. Burke Superior Court. May Term, 1868.

Augustus H. Anderson, of Burke county, Georgia, died in 1853, testate. The will was as follows:

Item 1st provided for the payment of his debts.

Item 2nd loaned to his wife certain slaves, and furniture, during her life, gave her a carriage and horses and the privilege of using his residences in Burke and Richmond counties, until the 1st of January, 1875, if she lived to that period.

Item 3d gave to one Bugg, the right to reside at his place, "Forehand," as long as he wished, etc.

ITEM 4th gave to Augustus Anderson, son of one Murphy, $500 00, to be held by Murphy for his use.

ITEM 5th gave to Adam and Maria, two old slaves, $20 00 each, *per annum*, and provided for their kind treatment.

ITEM 6th was as follows: "I desire and direct that my executors cause to be removed to a free State, and there emancipated, John, son of my negro woman slave, Louisa; that they pay the expenses of such removal, and for the reasonable support and schooling of said John, until he is put to a trade, and that when, if he do, reach the age of twenty-one years, they invest and secure for his benefit, as (they) may deem best, the sum of three thousand dollars, to be raised out of my estate."

ITEM 7th was as follows: "I desire and direct that my negro slave, Louisa, mother of said John, shall be kept at my Burke plantation till the 1st of January, 1875, that she be kindly treated and provided for, that she be employed as a seamstress as heretofore, and that she be paid by executors, annually, until that time, the sum of fifty dollars, if she choose then (in 1875) to go to a free State and be emancipated, my executors are directed to carry out her determination, and to invest and secure for her use, as they may think best, two thousand dollars, to be raised out of my estate, the interest of which she is to receive during her life, and then her son John, if in life, is to have the benefit of said investment absolutely. If said slave, Louisa, shall determine not to go to a free State, then I give her to my son-in-law, Moses P. Green, if then in life, or if not, to any one of the children or decendants of my daughter Martha, that said slave may select as her owner."

ITEM 8th gave to Moses P. Green absolutely the slaves before loaned him, with privilege of using any of testator's land till 1st January, 1875, *gratis.*

ITEM 9th appropriated $100 00 *per annum* till 1st January, 1875, to pay a missionary for his slaves.

ITEM 10th provided that the residue of his estate, with the wife's legacy, after her death, should be kept together till the 1st of January, 1875, etc.

ITEM 11th provided that the net income of the estate,

after paying legacies, should be paid one-third to his wife during life, one-third to said Greene during his life, remainder first to Greene's wife and then to the guardian of her children, and that the other third should be held by the executors for the uses, etc., specified in the 12th item; his wife's third, at her death, was to be divided in halves and go as the other thirds.

ITEM 12th provided that the income from 11th item should be invested as the executors thought best, to be paid to his daughter, Susan, or her children, as they needed it, and on the 1st of January, 1875, this fund to be paid to her children or their descendants.

ITEM 13th provided that, on the 1st of January, 1875, the *residuum* of the estate not disposed of, if his wife was then dead, be divided into halves, one-half to go to Martha's children and the other to Susan's children, on terms specified. A provision was also made here for the wife, should she be alive in 1875.

ITEM 14th provided that if Susan or Martha were alive on the 1st of January, 1875, and childless, each should take absolutely said half given to her children.

ITEM 15th required the executors to secure the legacies to the females to their sole use, unless they thought it not proper to do so.

ITEM 16th provided that if, on the 1st of January, 1875, no person was alive, or represented by lineal (not collateral) descendant, the executors should sell all the property as they thought best, (seeing that the slaves got good masters,) and pay $10,000 00 to the Georgia Female College, at Macon; $10,000 00 to the trustees of Emory College, at Oxford; $20,000 00 for the endowment of a free school of Brigham's district, Burke county; $20,000 00 for the endowment of another such school near Lester's district, in said county; and the executors were to see that necessary acts of incorporation were had for these purposes; any balance was to be used in building and endowing a college, under the control of the Methodist denomination, at Brothersville, Richmond county, Georgia, etc.

ITEM 17th nominated Moses P. Green, Charles J. Jenkins, Elisha A. Allen, and Andrew J. Miller, as his executors and testamentary guardians of any legatee who might be a minor when his or her legacy was payable.

The will was admitted to probate. Green, alone of said named executors, qualified as such. This negro, John, was then about twelve years old. In some way, (it does not appear how by the record,) the Superior Court of Burke county had this will, etc., before it, and in 1855 there was a decree, that Green, as such executor, should extinguish Bugg's claim by purchase, that he should, "under the direction of Thomas M. Berrien and Andrew J. Miller, solicitors in this cause, make such provision and investment for the slaves, John, Adam, Maria, and Louisa, and such disposition of them as will substantially carry out the provisions of said will in relation to them;" that Green be allowed to retain, for his own use, such sum out of the estate in his hands, as should, in the opinion of said solicitors, be sufficient consideration for the release of his privileges granted in said 8th item; that Green sell all the land of testator in Burke, and all the slaves thereon, (except Adam, John, Maria, and Louisa,) when and where, and on such terms as Green and the solicitors should agree upon, and that, after paying all legacies and fees, and costs, and making the investments provided for in the decree, the residue shall be invested, under the direction of said solititors, in State stock, or other stocks and securities for the uses and purposes specified in said will; that Green report annually to said Court, his action under the decree: and power was given to enlarge the decree if necessary to carry out the same. Pursuant to said decree, Green proceeded to sell the property; bought most of it himself, and paid the other legacies, etc. But he paid Louisa nothing. She died in 1858 or 1859. He did not execute the will as to John, but he was kept in Georgia and used as a slave until slavery was abolished. He became of age in 1862.

Upon the state of facts, set out in his bill for account against Green, filed in April, 1868, said negro, John, claimed that he should be paid the $3,000 00, also what it would

have cost Green to have executed the 6th item of the will, as to John, and also the annuity and legacy given to his mother by the 7th item of said will, with interest according to law.

Green's solicitors demurred to this bill upon the grounds that said 6th and 7th items of the will were void, under the Acts of the General Assembly of Georgia, passed in 1801 and 1818, prohibiting emancipation; because John never has had, nor has any capacity to take under said will, or to compel Green to perform; because John is not, and never was, a citizen of the United States of America, having such rights as to enable him to sue in any State or Federal Court, nor is there any law, State or Federal, giving him a right to sue for any claim arising before emancipation; because the whole will showed that Green had the right to refuse performance of the trusts in items six and seven specified; because, (as to the claim under his mother,) her death defeated any claim which she had, and because, for the reasons aforesaid, she could not take, and, therefore, could not transmit anything. Judge Gibson overruled the demurrer as to John's claim under the 6th item, leaving the other to be determined at the hearing. This decision is assigned as error by Green's solicitors, upon the points indicated in the demurrer.

J. J. JONES and A. M. ROGERS, for plaintiff in error, said the 6th item was void, because of the Acts of 1801 and 1818; Cobb's Digest, 983 and 991; *Miller vs. Lewis,* (unpublished decision of this Court during the war,) if that not so John could not enforce the claim. 14 *Ga. R.,* 198; 20, 510, 511; 23, 453; 26, 631; 2 Hill's Chan. R., 304. The decree is dormant. Code, secs. 2862, 4160. John was no party to it; it can be enforced only by *fi. fa.* or attachment. Code, secs. 4156, 4157. Emancipation gave nothing but freedom. 14 *Ga. R.,* 198; 20, 510; Civil Rights bill, Acts of Georgia, 1865–6, p. 239; Amendment United States Constitution, Art. XIV. This can only act prospectfully. 1 Kent's Com., 501; Constitutions of 1861 and 1865; 34 *Ga. R.,* 483; Constitution 1868.

E. T. LAWSON and JAMES S. HOOK, for defendant in error, replied, that the 6th item was not void, citing 4 *Ga. R.*, 445; 10, 263; 25, 109; Cobb on Slavery, secs. 282-3-4-5, 353-5-6, 364-5-6-7.

BROWN, C. J.

1. The testator, by his will, directed that the boy John be removed to a free State, and *there* emancipated, and that the expense of his removal, and of his reasonable support and schooling, till he was put to a trade, be paid out of the estate by the executors, and when he arrived at the age of twenty-one, the executors were directed to invest and secure for his benefit, the sum of $3,000 00, to be raised out of the estate of the testator. We hold that this was a legal bequest, and that it constituted a legal trust, which in no way contravened the policy of the State of Georgia at the time the will was made, or at the present time. I will not enter into a discussion of this question. It has been so ably discussed, and the rule so firmly established by this Court in a number of previous cases, as to render it a work of supererogation on my part. See *Vance vs. Crawford*, 4 *Ga.*, 445; *Cooper vs. Blakey*, 10 *Ga.*, 263; *Sanders vs. Ward, et al.*, 25 *Ga.*, 109. And see Cobb on Slavery, secs. 282-3-4-5, 353-5-6, 364-5-6-7.

2. The position being established that this was a legal trust, it follows that it was the duty of the qualified executor to execute it. Indeed, it was his sworn duty to execute it. His oath, as executor, bound his conscience to its faithful performance, and I have the authority of the late learned Chief Justice of this Court for saying, that this is a rare exception to the rule, which is, that executors or trustees have been faithful to their oaths in the execution of similar trusts. In *Sanders vs. Ward, et al.*, 25 *Ga.*, 121, Judge Lumpkin, in replying to the objection that such trusts could not be enforced, as slaves, as such, could not sue to have them executed, says: "This suggestion has been urged again and again, in connection with the point under consideration,

in all the slave States—in Alabama, Mississippi, South Carolina, Virginia, as our own past decisions show—and has been invariably overruled. Trustees are selected by the testator, on account of the confidence reposed in them, and usually they will discharge their duty. And if there be doubts, they will apply to the courts for direction. However faithless we may be to the living, we are rarely so to the dead. If the heirs move in the matter, this will give the courts jurisdiction, and they will compel, by their decree, an execution of the trust. How many trusts of this sort all over the slave States, and in this State, have been executed? Have *any failed for want of fidelity in the trustee?* This objection is imaginary." Had the learned Chief Justice lived to try this case, he would have been compelled to admit that at least one exception to the rule that we are not faithless to the dead exists, and that the objection is not in every case imaginary.

But did the failure of this executor to execute this will, in compliance with the solemn oath which he had taken, and his conduct in retaining John as a slave in this State, in palpable violation of what he knew to be the wish and will of his father-in-law while in life, destroy the trust, and leave the *cestui qui trust* after he came of age, and became free, without a remedy? We think not. Equity considers that done which ought to be done, and directs its relief accordingly. Revised Code, section 3031. This trust was a legal one. It ought to be executed, and a Court of Equity will so direct its relief as to enforce its execution.

3. But it is insisted that the changed condition of the country, renders it impossible to execute the trust, as John has become free in Georgia, and no one has the right to compel him to go to a free State, as directed by the will. And it is further urged, with great earnestness, by the learned counsel for the plaintiff in error, that John has the right to sue in the Courts of Georgia, for any legacy given to him while a slave, or for the execution of any trust that was created in his favor while he was a slave. While we admit the ingenuity of the argument, and admire the ability with which it was urged, we

can not subscribe to the proposition as a sound one. It is true, the will can not now be literally executed. By the neglect of the executor, to use the very mildest term, John was not permitted to go to a free State while a minor, as directed by the testator. But soon after he came of age, the free state, by the results of the late unfortunate civil war, came to him. He not only became a free man, but he acquired a *status* in the Courts of the State. He acts for himself, and has the right to litigate with the executor on terms of equality before the law. And, we hold that he now has the right, in a Court of Equity, to call the executor to account, and to compel the execution of the trust in his favor in accordance with the will, or as nearly so as the changed condition of the country will permit, and to recover, not only the legacy left him by the will, but such reasonable and just compensation for the support and education which the will directed that he should have, as may be found to be due and unpaid.

4. It was insisted that the rule which we have adopted in this case, if announced, would lead to an immense amount of litigation, as it would authorize freedmen to maintain suits in the Courts of this State, for injuries done to their persons while they were slaves, and for wages during the same period. We anticipate no such results. There is a very broad distinction between the rule which we maintain and the one which counsel insists will follow as a necessary consequence. We hold that a freedman of legal age, may commence proceedings to enforce, in the Courts of this State, any existing legal or equitable right, created in his favor while he was a slave, that did not then contravene the policy or violate the laws of the State. If, in other words, a legal trust was created in his favor, while he was a slave, which he had no right to ask the Courts to enforce, but which it was the right and duty of an executor or trustee to execute, or to enforce in the Courts for him, he may now institute proceedings in his own name, to enforce it, if the executor or trustee still refuses to account to him, or fails to execute the trust.

But we hold that a freedman has no right of action in our Courts, to recover damages for injuries done to his person

while he was a slave, or for wages on account of labor done by him as a slave. As the law then stood, his labor belonged to his owner, and the owner alone had a right of action to recover damages for injuries to his person. By his transition from slavery to freedom, no such right of the owner has been transferred to him. I may add, that, under our last statute of limitations, all such actions for personal injuries, not already commenced, are forever barred and foreclosed.

Judgment affirmed.